WYTHE, Judge.
Among all the advantages, which have arisen to mankind, from the study of letters, and the universal diffusion of knowledge, there is none of more importance, than the tendency they have had to produce discussions upon the respective rights of the sovereign and the subject; and, upon the powers which the different branches of government may exercise. For, by this means, tyranny has been sapped, the departments kept within their own spheres, the citizens protected, and general liberty promoted. -But this beneficial result attains to higher perfection, when those, who hold the purse and the sword, differing as to the powers which each may exercise, the tribunals, who hold neither, are called upon to declare the law impartially between them. For thus the pretensions of each party are fairly examined, their respective powers ascertained, and the boundaries of authority peaceably established. Under *these impressions, I approach the question which has been submitted to us: and, although, it was said the other day, by one of the judges, that, imitating that great and good man lord Hale, he would sooner quit the bench than determine it, I feel no alarm ; but will meet the crisis as I ought; and, in the language of my oath of office, will decide it, according to the best of my skill and judgment.
I have heard of an english chancellor who said, and it was nobly said, that it was his duty to protect the rights of the subject, against the encroachments of the crown; and that he would do it, at every hazard. But if it was his duty to protect a solitary individual against the rapacity of the sovereign, surely, it is equally mine, to protect one branch of the legislature, and, consequently, the whole community, against the usurpations of the other: and, whenever the proper occasion occurs, I shall feel the duty; and, fearlessly, perform it. Whenever traitors shall be fairly convicted, by the verdict of their peers, before the competent tribunal, if one branch of the legislature, without the concurrence of the other, shall attempt to rescue the offenders from the sentence of the law, I shall not hesitate, sitting in this place, to say, to the general court, Fiat justitia, ruat coelum; and, to the usurping branch of the legislature, you attempt worse than a vain thing; for, although, you cannot succeed, you set an example, which may convulse society to its centre. Nay more, if the whole legislature, an event to be deprecated, should attempt to overleap the bounds, prescribed to them by the people, I, in administering the public justice of the country, will meet the united powers, at my seat in this tribunal; and, pointing to the constitution, will say, to them, here is the limit of your authority; and, hither, shall you go, but no further.
Waving, however, longer discussion upon those subjects, and proceeding to the question, immediately, before us, the case presented is, that three men, convicted of treason against the state, and condemned by the general court, have pleaded a pardon, by the house of delegates, upon which *that house insists, although the senate refuses to concur; and the opinion of the court is asked, whether the general court should award execution of the judgment, contrary to the allegation of the prisoners, that the house of delegates, alone, have the power to pardon them, under that article of the constitution, which says, “But he (the governour) shall, with the advice of the council of state, have the power of granting reprieves or pardons, except where the prosecution shall have been carried on by the house of delegates, or the law shall otherwise particularly direct; in which cases, no reprieve, or pardon, shall be granted, but by resolve of the house of delegates.”
Two questions are made,
1. Whether, this court has jurisdiction in the case?
2. Whether the pardon is valid?
The first appears, to me, to admit of no doubt; for the act constituting this court is express, that the court shall have jurisdiction “In such cases as shall be removed, before them, by adjournment from the other courts before mentioned, when questions, in their opinion, new and difficult, occur.” Chan. Rev. 102: which emphatically embraces the case under consideration.
The sole enquiry therefore is, whether the pardon be valid?
If we consider the genius of our institutions, it is clear, that the pretensions of the house of delegates cannot be sustained. For, throughout the whole structure of the government, concurrence of the several branches of each department is required to give effect to its operations. Thus the governour, with the advice of the council of state, may grant pardons, commission officers, and embody the militia; but he can do neither without the assent of the council: the two branches of the legislature may pass laws, but a bill passed by one of them has no force: and the two houses of assembly may elect a judge; but an appointment, by one of them only, would be useless. This general requisition of union seems, of itself, to indicate, that nothing was intended to be done, in any depart *636 ment, without it; and, accordingly, *the fourth section of the constitution declares, that “The legislature shall be formed of two distinct branches, who, together, shall be a complete legislature;” and the eighth, “that all laws shall originate in the house of delegates, to be approved or rejected- by the senate.” Thus requiring., in conformity to the regulations throughout the whole fabric of government, an union of the two branches, to constitute a legislature; and an union of sentiment in the united body, to give effect to their acts. And it is not to be believed, that, when, this union was so steadfastly demanded, even in the smallest cases, it was.meánt to be dispensed with, in one of the first magnitude, and which might involve the vital interests of the community.
But if we advert to the motive for ■ the regulation, the necessity for concurrence will be more apparent. For it is obvious, that the contests in England between the house of commons, and the crown, relative to impeachments, gave rise to it, as the king generally pardoned the offender, and frustrated the prosecution. With this in view, the power of pardoning cases of that kind, was taken from the executive here, and committed to other hands, in order that the evil complained- of, there, might be removed. But. the interpretation contended for ..by the house of delegates, in effect, reverses the object. Thus the object was to put a check to prerogative in one department ; the effect is to remove all check, and establish prerogative in another department. The object was to prevent disappointment, by one department, of the national will; the effect is to enable, less than a department, to defeat it. The object was to enable the whole legislature to provide for the public safety, by insuring the punishment of dangerous offenders; ■ the effect is to enable one branch of the legislature to turn him loóse upon society, without the consent of the other. Such monstrous consequences could not have been intended by the framers of the constitution. For what motive could the convention, when providing for the public safety, have had for an arrangement, which might impair, but could not increase, it? *If, in a common case, the house of delegates was not permitted to' pardon without the concurrence of the senate, although no public danger would attend it, what reason can be assigned for a different rule, where it was anxiously provided that the legislature might, for the sake of the public security, prohibit a pardon; and where the safety of the state might depend upon it?
This view of the subject confines the object of the provision of the constitution, now under consideration, to cases where the prosecution is carried on by the house of delegates; and justifies the first interpretation contended for by the attorney general, of reading the words. “Or the law shall otherwise particularly direct,” in parenthesis: so as to limit the power of pardoning, by the house of delegates, to cases of impeachment prosecuted, by them, under the sixteenth and seventeenth sections of the constitution. Which is, manifestly, the intention of the clause. For I ■have shewn that the whole article -was bottomed upon the contests in England, between the house of commons and the crown, relative to impeachments; and as the remedy applied there, by the statute of William the third, was confined to that species of crimes, leaving all others, to the usual course of pardon by the crown, or by act of parliament; so here in pursuance of the system, and in imitation of that statute, the power of pardoning, by the house of delegates, was confined to cases, whether they prosecuted themselves; leaving all others to the ordinary course of remission, by the executive when they have the power; and, when they have not, to the legislature. For, although it was reasonable to allow them to relinquish their own suit, it was not so, where the prosecution was carried on by government, for the benefit of the community, under laws made, by both branches of the legislature, to secure the public safety. The word cases, in the ■plural number, makes no difference, 1. Because it was probable there would be more than one case of a prosecution by the house of delegates; and therefore the plural number was properly used, with a view to that ^possibility. 2. Because the letter s may be rejected, as accidentally added against the intent.
But suppose the reading, by parenthesis, not to be adopted, the pretensions of the house of delegates would, nevertheless, not be authorized.
1. Because, the construction, as the attorney general observed, must still be according to the meaning of the constitution ; and, although the house of delegates must originate the resolution, the senate must concur,- or it will have no effect; as it would be absurd to suppose, that the instrument which required the whole legislature to make a general provision, should authorize one branch to repeat it: and that, too, in the most vital cases, where the prohibition of pardon was concurred in, by both houses, in order to secure the public safety.
2. Because 'the word resolve has two senses: The first, where it applies to the affairs of the house only, without affecting the general interests of the country; and, then, the resolution is complete, without the assent of the senate. The second, where it extends to the whole community; and, then, the resolution being legislative in its nature, requires the concurrence of the whole legislature, as every thing does, which affects the public at large.
The latter is the sense in which the word ought to be taken in the present case, 1. Because it goes to repeal a law; which can only be done by another law: and that makes the concurrence of the senate indispensable: for the constitution says, that all laws shall originate in the house of delegates, and shall be approved, or rejected by the senate; but a resolution, affecting the whole community, is, in fact, a law, although it bears a different name: which brings it, precisely, within the course of legislation prescribed by the constitution. 2. Because a word of equivocal signification, ought to be understood according to *637 that sense, which is conformable to the general scope of the instrument; for the general scope manifests the particular intent of those, who used it.
*These arguments receive some illustration from the twentieth section of the constitution, recognizing the power of the whole legislature, and not one branch, to abolish penalties and forfeitures : which is contravened by the other construction; for, if the house of delegates can remit part of the penalty, they may the whole, as well the forfeiture of the goods, as the corporal suffering. An idea utterly inconsistent, with the recognition of a power, in the whole legislature, to do it.
Every view of the subject, therefore, repels the construction of the house of delegates: and, accordingly, the practice is said to have been against it, ever since the formation of the government: which seems to have been the understanding upon the present occasion; for the resolution provides, that it shall be sent, to the senate, for concurrence.
This mode of considering the subject, obviates the objection made by the prisoners’ counsel, relative to the constitutionality of the law concerning treason ; for, according to the interpretation just discussed, there is nothing unconstitutional in it.
I am, therefore, of opinion, that the pardon pleaded by the prisoners is not valid; and that it ought to be so certified, to the general court.
PENDLETON, President.
Upon the preliminary question, respecting the power of the general court to adjourn criminal cases into this court for difficulty, and of this court to hear and decide upon them when so adjourned; it is objected that the law for establishing the general court, gives that court a power to hear and determine all treasons, murders, felonies, or other crimes and misdemeanours, and makes no provision for an appeal, or writ of error to this court, or adjournment hither, on account of difficulty. But this, to decide the present question, concludes nothing; since the same law gives that court power to take cognizance of, and to hear and determine all civil suits at common law, and some other controversies; and is equally silent as to an appeal, 'xwrit of error, or power of adjournment, in those cases; and yet there is no doubt but, in such cases, the writ of error will lie, or the decision may be adjourned hither by that court. ’Tis not, therefore, to this law, but to that for constituting this court, we must recur for the rule by which to determine the question. The jurisdiction given to the court has three branches:
1. An original jurisdiction over such suits as may be commenced, or adjourned there, by direction of any particular law, without which, no original suit can be commenced in this court; of this nature are the land claims now depending; and impeachments, which the constitution of government allows against the judges of the general court.
2. Of such as shall be brought before them by appeal from, or writ of error to, decrees of the high court of chancery, judgments of the general court, or sentences of the court of admiralty, when they are final, and the matter in controversy be equal, in value, to /'SO., or be a freehold, or franchise.
3.Also, in such cases as shall be removed before them, by adjournment from the other courts, when questions, in their opinion new and difficult, occur.
A fourth branch of business is mentioned, but that was of a special nature, and will cease, as soon as two suits now depending, are determined.
In the two first branches, the terms suits and controversies are used, in terms proper to describe disputes between litigant parties, and would seem to exclude criminal cases; especially when the idea of value is annexed to them; which cannot be applied to that inestimable blessing, life. But, in the third branch, those terms are dropt, and the more general one of cases adopted; which appears to have been the result of wisdom, and contemplated leaving the other courts at full liberty to adjourn every case before them, whether civil or criminal, if upon a view of its difficulty or its importance, either in itself, or the consequences ^'attending it, they shall choose to refer it to the decision of the whole judges, in their collective capacity, in this court. The words are general enough to comprehend criminal as well as civil cases; for the former are, equally with the latter, cases on which the judges are to decide ; and, of course, in which they are authorized to refer the decision to this court; for that power, in them, is implied, in giving this court jurisdiction over cases so adjourned. It has been supposed, however, that the general terms cases, is explained to mean the same as suits and controversies in the two first branches, by a subsequent clause of the act, which directs that a clear and concise state of the case of each party in such appeal, writ of error, or controversy adjourned, shall be prepared and signed by his counsel, printed at his expence, and that expence taxed in the bill of costs, and one delivered to each judge. Words which undoubtedly refer to controversy, where there are contending parties, expences, and costs, to be taxed upon the event of the determination. Yet, I should think this latter clause insufficient to control so important a power as appears to be given in the first clause; even if it did not admit of an application to a different purpose, than that of explaining the term cases, used in the clause giving the jurisdiction. But, I conceive this diversification of the terms not to have been used by the legislature lightly, or intended to convey the same idea by different expressions, but was wisely made to answer a just and proper purpose; as thus, criminal cases, as well as civil controversies, might be adjourned under the terms of the first clause. In such there were no parties to prepare a state of the case, or pay the ex-pence of printing them, nor costs to be awar-ded in which they were to be included ; and therefore, in those instances, this state of the case was not required to be made; for that was to be done only in civil controversies adjourned. I interpret this lat *638 ter clause therefore, not as explanatory of the whole jurisdiction given by the former clause, but as restraining the necessity of printed cases to a particular sort of those cases which might *be adjourned, and then there remains with me no difficulty in the question. The argument of inconvenience is mentioned ; which is always properly considered as of great weight in determining a new case; especially in this court, whose decisions are to fix the law. If I was to consider this question in a political light, I should wonder indeed, that disputes about property to the value of ;£50., which dwindles into nothing when compared with the subject which gives rise to the present discussion, might be removed for difficulty, and that in a case where the judges are to decide between the safety of the state on the one hand, and the life of a citizen on the other, however overwhelmed with doubts and difficulties, they must go through them and determine without that assistance Which they might wish to have on the occasion; the reason for such assistance, must increase in proportion to the magnitude of the subject; and therefore, although the legislature seems to think some things too low, they do not declare any thing too high, for the jurisdiction of this court, that is within the judiciary powers. The objection of some of the judges, not being present, would be unanswerable, if matters of fact were, to be discussed, on the final judgment pronounced here; but as it is a matter of law and not fact to be determined on, I do not see the inconveniences or impropriety of their absence; or, if their presence should be desired, why a mode may not be adopted to bring them hither. As to the delay', I can only say, it is left with the judges of the general court to determine, upon considering the difficulty and importance of the case on the one hand, and the delay and other inconveniences on the other, to determine whether they will decide themselves, or require the assistance of the other judges. This power the legislature have given them, and I have neither inclination nor authority to take it from them.
The question, upon the merits, is whether by the paper stated in the record as the resolution of the house of delegates, these three unhappy men stand pardoned of the treason of which they are attained in the general court, or still ^remain subject to the execution of the judgment which passed against them upon their conviction? If the exclusive power of the house of delegates on this occasion was to be admitted, it would be difficult to maintain that this resolution should operate as a pardon, since those who made it, by sending it to the senate for their concurrence, appear to have suspended its operation until the concurrence of the senate should be obtained; which not having happened, the force of it stands as yet suspended; or rather the senate by rejecting this, and the house of delegates not passing another, their power remains unexercised, and the attainder retains its full force. But, as I do not make this the ground of my judgment, I shall pass to the two great points into which the question has been divided, whether, if the constitution of government and the act declaring what shall be treason are at variance on this subject, which shall prevail and be the rule of judgment? And then, whether they do contravene each other? The constitution of other governments in Europe or elsewhere, seem to throw little light upon this question, since we have a written record of that which the citizens of this state have adopted as their social compact; and beyond which we need not extend our researches. It has been very properly said, on all sides, that this act, declaring the rights of the citizens, and forming their government, divided it into three great branches, the legislative, executive, and judiciary, assigning to each its proper powers, and directing that each shall be kept separate and distinct, must be considered as a rule obligatory upon every department, not to be departed from on any occasion. But how far this court, in whom the judiciary powers may in some sort be said to be concentrated, shall have power to declare the nullity of a law passed in its forms by the legislative power, without exercising the power of that branch, contrary to the plain terms of that constitution, is indeed a deep, important, and I will add, a tremendous question, the decision of which might involve consequences to" which gentlemen may not have extended their ideas. I am happy in being *of opinion there is no occasion to consider it upon this occasion; and still more happy in the hope that the wisdom and prudence of the legislature will prevent the disagreeable necessity of ever deciding it, by suggesting the propriety of making the principles of the constitution the great rule to direct the spirit of their laws.
It was argued by the counsel for the prisoners, that the interpretation, now to be made, ought, in favour of life, to incline to the side of mercy, and that compassion for the misguided and unfortunate ought to have some influence on our decision.
Mercy — divine attribute I Often necessary to the best: sometimes due to the worst: and, from the infirmities of our nature, always to be regarded, when circumstances will admit of it. But how, in public concerns, this is'to be accomplished with just attention to the general welfare, has, in every age, been a desideratum with statesmen and legislators. Eor, in human associations, other considerations, as well as the dictates of mercy, must be attended to. Compassion for the individual must frequently yield to the safety of the community. Society proceeds upon that principle. Men surrender part of their natural rights to ensure protection for the residue against domestic., violence, and hostilities from abroad; which can only be effected by the due execution of wholesome laws calculated to maintain the rights of private citizens, and the integrity of the state. But how would this be promoted by letting loose notorious offenders to burn, to rob, and to murder, or to aid a foreign foe in his unjust attempts upon the liberties of the country? Mercy, in such cases, to one, would be cruelty to the rest.
*639 Aware of this, the makers of the constitution, considering that, although, in representative governments, the laws should be mild, they ought to be rigidly executed; and that, although a power to pardon, which had often been abused in England, should exist some where, it ought never to be exercised without proper cause, framed the clause now under consideration; which provides that the govern our, or '“'chief magistrate, “shall not, under any jfretence, exercise any power or prerogative by virtue of any law, statute, or custom of England; but he shall, with the advice of the council of state, have the power of granting reprieves and pardons not in all cases indiscriminately, but in such only as were least liable to abuse; the rest were confided to agents less exposed to temptation.
Thus the power was, in general, committed to the executive: But, as to cases concerning the conduct of public officers, and those which policy might suggest to the legislature as proper to be taken from the chief magistrate and his council, it was thought a safer depository, beyond the reach of the various passions and motives which might influence a few individuals, would be found in the general assembljT: and therefore the clause excepts cases of impeachment; and those which the law might otherwise provide for. In these, the power of pardoning is reserved to the representatives of the people: But whether to one or both houses is the important question. A question which should be decided according to the spirit, and not by the words of the constitution.
The language of the clause is inaccurate, and admits of both the constructions mentioned by the attorney general, that is to say, 1. By throwing the words, 1 ‘or the law shall otherwise particularly direct, ’ ’ into a parenthesis, to confine the power of pardoning, by resolution of the house of delegates alone, to cases of impeachment onljr: and to leave those which the general assembly might take from the executive, to the direction of the laws made for the purpose. 2. By taking the clause altogether, to make the representatives of the people the source of mercy, provided the consent of the senate was obtained. Either view of the subject satisfies the present enquiry; but I prefer the first, as most congenial to the spirit, and not inconsistent with the letter, of the constitution.
The treason law appears to have been framed upon this idea; and, in passing it, the legislature have, in my opinion, '“'pursued, and not violated, the constitution. Indeed the house of delegates appear to have understood it so themselves, as they sent the resolution to the senate for their concurrence, which not having been obtained, the resolution is of no force, and the pardon falls to the ground.
Chancellor Blair and the rest of the judges, were of opinion, that the court had power to declare any resolution or act of the legislature, or of either branch of it, to be unconstitutional and void; and, that the resolution of the house of delegates, in this case, was inoperative, as the senate had not concurred in it. That this would be the consequence clearly, if the words, “or the law shall otherwise particularly direct,” were read in a parenthesis; for then the power of pardoning by the house of delegates, would be expressly confined to cases of impeachment by that house; and, if read without the parenthesis, then the only difference would be, that the assent of the two houses would be necessary; for it would be absurd to suppose that it was intended, by the constitution, that the act of the whole legislature should be repealed by the resolution of one branch of it, against the consent of the other.
The certificate to the general court was as follows:
“The court proceeded, pursuant to an order of the court of Thursday last, to render their judgment on the adjourned question, from the general court, in the case of John Catón, Joshua Hopkins and James Bamb; whereupon it is ordered to be certified, to the said general court, as the opinion of this court, that the pardon, by resolution of the house of delegates, severally pleaded and produced in the said court, by the said John Catón, Joshua Hopkins and James Lamb, as by the record of their case appears, is invalid.”
N. B. It is said, that this was the first case in the United States, where the question relative to the nullity of an tin-constitutional *law was ever discussed before a judicial tribunal: and the firmness of the judges (particularly of Mr. Wythe,) was highly honourable to them; and will always be applauded, as having, incidentally, fixed a precedent, whereon, a general practice, which the people of this country think essential to their rights and liberty, has been established.